1 | M. LAURENCE POPOFSKY (SBN 33946)
MARIE L. FIALA (SBN 79676)
2 | THOMAS E. REIBER (SBN 162572)
ADAM M. COLE (SBN 145344)
3 | HELLER EHRMAN WHITE & McAULIFFE LLP
333 Bush Street
4 | San Francisco, CA  94104-2878
Telephone: (415) 772-6000
5 | Facsimile: (415) 772-6268

6 | Attorneys for Plaintiff
PACIFIC GAS AND ELECTRIC COMPANY
7

8 | ROGER J. PETERS (SBN 77743)
ROBERT BORDON (SBN 50157)
CHRISTOPHER J. WARNER (SBN 140915)
9 | LAW DEPARTMENT
PACIFIC GAS AND ELECTRIC COMPANY
10 | Post Office Box 7442
San Francisco, CA 94120
11 | Telephone: (415) 973-3842
Facsimile: 973-0516
12

13 | UNITED STATES DISTRICT COURT

14 | NORTHERN DISTRICT OF CALIFORNIA

15 | SAN FRANCISCO DIVISION

16

17 | PACIFIC GAS AND ELECTRIC COMPANY,
a California corporation,

| Case No.:  C 01-03023 VRW

18 | Plaintiffs,

| **PLAINTIFF PACIFIC GAS AND
ELECTRIC COMPANY'S MOTION
FOR SUMMARY JUDGMENT ON
FIRST AND SECOND CLAIMS FOR
RELIEF [F.R.C.P. 56(a) and (c)]**

19 | v.

20 | LORETTA M. LYNCH, HENRY M.
DUCQUE, RICHARD A BILAS, CARL W.
21 | WOOD, and GEOFFREY F. BROWN in their
official capacities as Commissioners of the
22 | California Public Utilities Commission,

| Date:    May 24, 2002
Time:    10:00 a.m.
Court:   The Hon. Vaughn R. Walker
          Courtroom 6, 17th Floor

23 | Defendants.

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................ 1

II.   STATEMENT OF FACTS ................................................................................................. 4

A. Electric Industry Regulation Under California Law .......................................... 4

(1) Electric Industry Restructuring Under AB 1890 ................................... 4

(2) The California Wholesale Electricity Markets ...................................... 5

(3) Regulatory Accounts Used to Track Purchases of Wholesale
Electricity, and Other Costs and Revenues:  The TRA and TCBA .................. 6

(4) The CPUC's "PTER" Decisions ........................................................... 7

B. PG&E's Purchases of Wholesale Electricity ..................................................... 7

(1) All of PG&E's Purchases of Wholesale Electricity and Costs of
Transmission at Issue in this Case Were Incurred Pursuant to
Federally-Filed Tariffs .............................................................................. 7

(2) The CPUC Repeatedly Has Declared That PG&E's PX and ISO
Purchases Were Conclusively Reasonable and Not Subject to
"Prudence" Review .................................................................................... 8

C. The Wholesale Electricity Market Crisis ........................................................... 8

D. The Acct'g Order:  The CPUC's Refusal to Provide Meaningful Rate Relief ....... 9

III.  LEGAL ARGUMENT ................................................................................................... 10

A. The Basic Contours of the Filed Rate Doctrine Are Not Open to Dispute ........... 10

(1) The Filed Rate Doctrine Consists of Two Complementary Strands ........ 11

a. The "Preemption" Strand ........................................................ 11

b. The "Non-Justiciability" Strand ............................................. 12

(2) The Filed Rate Doctrine Applies to Market-Based Rates ...................... 13

(3) The Filed Rate Doctrine Applies Irrespective of Whether the CPUC's
Actions "Conflict" with the Federal Wholesale Market Regulatory
Scheme .................................................................................................... 14

B. The CPUC's Acct'g Order Does Not Satisfy the Filed Rate Mandate ................. 15

(1) May PG&E's Wholesale Costs Be Recovered From Collateral Sources
of Revenue Which Are Not Derived From Retail Rates? ........................... 15

(2) May the CPUC Reach Back Four Years to Net PG&E's Power Costs Against Historic Revenues?...............................................................17

(3) Should Historic "Headroom" Be Treated Differently than Other Past Revenues for Filed Rate Purposes? ...................................18

C. The Acct'g Order Does Not Provide an Adequate and Independent State Ground for Avoiding the Filed Rate Doctrine. .............................19

D. A *Pike County* Review is Sharply Circumscribed in this Case. .........................................21

(1) The CPUC Has Held Unequivocally that PG&E's Purchases from the ISO and PX Are Conclusively Reasonable and Not Subject to Prudence Review..........................................................22

(2) In Any Event, Any Pike County Review of PG&E's Load Bidding Strategy in the PX and ISO Markets Would Violate the Filed Rate Doctrine. .........................................................22

(3) The Court May Enter Summary Judgment in PG&E's Favor, and Allow the CPUC to Conduct a Limited Reasonableness Review. ...................24

IV.    CONCLUSION ............................................................25

# TABLE OF AUTHORITIES

Pages

## CASES

*Arizona Grocery Co. v. Atchison, Topeka and Santa Fe Railway Co.*,
    284 U.S. 370 (1932) ........................................................................ 12

*Arkansas Louisiana Gas Co. v. Hall*,
    453 U.S. 571 (1981) ................................................................... 12, 23

*Associated Natural Gas Co. v. Public Serv. Comm'n*,
    954 S.W.2d 520 (1997).................................................................. 17

*Board of Public Utility Comm'rs v. New York Tel. Co.*,
    271 U.S. 23 (1926) ....................................................................... 3, 18

*CPUC v. FERC*,
    254 F.3d 250 (D.C. Cir. 2001)...................................................... 14

*Calfarm Ins. Co. v. Deukmejian*,
    48 Cal. 3d 805 (1989)................................................................... 18

*In re California Power Exchange Corp.*,
    245 F.3d 1110 (9th Cir. 2001)................................................... 4, 22

*Campbell v. San Diego Gas & Electric Co.*,
    No. CV-00-2382-RHW (E.D.Wa. Sep. 14, 2001) ...................... 13

*County of Stanislaus v. Pacific Gas and Electric Co.*,
    114 F.3d 858 (9th Cir. 1997) ........................................................ 12

*Duke Energy Trading & Marketing, L.L.C. v. Davis*,
    267 F.3d 1042 (9th Cir. 2001), *pet. for cert. filed*, 70 USLW 3580 (Mar. 5,
    2002)................................................................................. 13, 14, 16

*Electrical District No. 1 v. FERC*,
    774 F.2d 490 (D.C. Cir. 1985), *abrogated on other grounds*, Transwestern
    Pipeline Co. v. FERC, 897 F. 2d 570 (D.C. Cir. 1990)...................... 15

*England v. Louisiana State Board of Medical Examiners*,
    375 U.S. 411 (1964) ..................................................................... 9-10

*Fax Telecomm. Inc. v. AT&T*,
    138 F.3d 479 (2d Cir. 1998) ...................................................... 13, 23

*FPC v. Southern Cal. Edison Co.*,
    376 U.S. 205 (1964) ...................................................................... 14

*General Motors Corp. v. Illinois Commerce Commission*,
    574 N.E.2d 650 (Ill. 1991) ............................................................ 17

*Howlett v. Rose*,
    496 U.S. 356 (1990) ...................................................................... 20

iii

# TABLE OF AUTHORITIES (Continued)

Pages

*Indiana & Michigan Electric Co. v. FPC*,
  502 F.2d 336 (D.C. Cir. 1974) ................................................................. 15

*Kentucky West Virginia Gas Co v. Pennsylvania Public Utility Comm'n*,
  862 F.2d 69 (3d Cir. 1988) ...................................................................... 16

*Keogh v. Chicago & Northwestern Railway Co.*,
  260 U.S. 156 (1922) .................................................................. 10, 13, 23

*Mississippi Power & Light Co. v. Mississippi*,
  487 U.S. 354 (1988) .................................................. 2, 5, 11, 12, 14, 16

*Montana-Dakota Utilities Co .v. Northwestern Public Service Co.*,
  341 U.S. 246 (1951) ...................................................................... 11, 23, 24

*NAACP v. Alabama*,
  357 U.S. 449 (1958) ................................................................................. 21

*Nantahala Power & Light Co. v. Thornburg*,
  476 U.S. 953 (1986) ...................................................... 2, 5, 11, 12, 15-16, 16

*Pike County Light & Power Co. v. Pennsylvania Public Utility Commission*,
  465 A.2d 735 (Pa. Commw. Ct. 1983) .......................................... 4, 24, 25

*Public Service Co. v. Patch*,
  87 F. Supp. 2d 57 (D. N.H.), *aff'd*, 221 F. 3d 198 (1st Cir. 2000) ........... 2, 16

*Public Service Co. v. Patch*,
  221 F.3d 198 (1st Cir. 2000), *cert. denied*, 531 U.S. 1145 (2001) ........... 16, 19

*Rogers v. Alabama*,
  192 U.S. 226 (1904) ................................................................................. 20

*Southern Cal. Edison. v. Lynch*,
  No. 00-12056-RSWL (Jan. 22, 2001) .................................................... 25

*Town of Concord v. FERC*,
  955 F.2d 67 (D.C. Cir. 1992) .................................................................. 15

*Town of Norwood v. New England Power Co.*,
  202 F.3d 408 (1st Cir. 2000) .................................................................. 14

*Transwestern Pipeline Co. v. FERC*,
  897 F.2d 570 (D.C. Cir. 1990) ......................................................... 14, 15

*Transmission Agency v. Sierra Pacific Power Co.*,
  2002 WL 553845 (9th Cir. Apr. 16, 2002) ...................... 4, 11, 13, 21, 22-23, 24

*United States v. Georgia-Pacific Co.*,
  421 F. 2d 92 (9th Cir. 1970) .................................................................. 18

iv

# TABLE OF AUTHORITIES (Continued)

Pages

*Ward v. Board of County Comm'rs,*
   253 U.S. 17 (1920) ...........................................................................................21

*Washington Gas Light Co. v. PSC,*
   508 A.2d 930 (D.C. 1986) ...............................................................................17

## STATUTES AND CODES

Pub. Util. Code §

   330(d)......................................................................................................................4
   330(r)......................................................................................................................4
   330(s)......................................................................................................................5
   367(a)......................................................................................................................5
   367(b)................................................................................................................5, 10
   368(a)......................................................................................................................5
   451..........................................................................................................................4
   761..........................................................................................................................4
   840(d)....................................................................................................................11
   840(e)....................................................................................................................10
   840(g)....................................................................................................................11
   840-47....................................................................................................................5

## REGULATORY DECISIONS

*Order Directing Remedies,*
   93 FERC ¶ 61,294, 2000 FERC LEXIS 2491 (Dec. 15, 2000)........................17

*Re San Diego Gas and Electric Co.,*
   96 FERC ¶ 61,120, 2001 FERC LEXIS 1810 (July 25, 2001)........................14

*Order Instituting Rulemaking,*
   D.95-12-063 (Dec. 20, 1995), as amended by, D.96-01-009
   (Jan. 10, 1996) ...............................................................................22, App. A

*In re PG&E,*
   D.97-06-060, 1997 Cal. PUC LEXIS 231 (June 11, 1997) ...............................7

*Order Instituting Rulemaking,*
   D.97-10-057, 1997 Cal. PUC LEXIS 988 (Oct. 22, 1997)................................6

*Interim Opinion re PG&E,*
   D.99-10-057 (Oct. 21, 1999) ............................................................................7

v

# TABLE OF AUTHORITIES (Continued)

Pages

Order Granting Limited Rehearing of D.99-10-057,
D.00-03-058 (Mar. 16, 2000) .........................................................................................7

*Final Opinion Regarding Policies Related to Post-Transition Ratemaking*,
D.00-06-034 (June 8, 2000) ...................................................................... App. A

*Decision re Bilateral Contracts*,
D.00-08-023 (Aug. 3, 2000) ...................................................................... App. A

*Interim Opinion Regarding Emergency Requests For Rate Increases*,
D.01-01-018 (Jan. 4, 2001)............................................................................9

*Interim Opinion Regarding Proposed Rate Increases*,
D.01-03-082 (Mar. 27, 2001) .........................................................................1

*CPUC Resolution E-3527*,
1998 Cal. PUC LEXIS 1027 (Nov. 19, 1998) ..........................................6, 21

*CPUC Resolution E-3618*,
1999 Cal. PUC LEXIS 902 (July,8, 2000) ................................................ App. A

*CPUC Resolution E-3658*,
2000 Cal. PUC LEXIS 416 (Mar. 16, 2000) .............................................. App. A

## NOTICE OF MOTION, MOTION, AND STATEMENT OF RELIEF SOUGHT

PLEASE TAKE NOTICE that on May 24, 2002, at 10:00 a.m, or as soon thereafter as the matter may be heard, Pacific Gas and Electric Company ("PG&E") will and hereby does move this Court for Summary Judgment on the First and Second Claims for Relief in its Complaint on the ground that no triable issue of fact exists as to those Claims and that PG&E is entitled to judgment as a matter of law.  This motion is based on the below Points and Authorities, the accompanying Declarations and Request for Judicial Notice, and all pleadings and papers on file.

PG&E seeks a declaration that defendants' refusal to allow PG&E to recover its federally regulated costs of procuring wholesale electricity and interstate electric transmission violates the "filed rate doctrine," and is preempted by federal law.  Specifically, PG&E requests a declaration that:

1.  It is entitled to recover its wholesale power and interstate transmission costs undercollection prospectively in retail rate revenues;

2.  The scope of any "*Pike County*" reasonableness review of PG&E's procurement practices that the CPUC may conduct is sharply circumscribed by federal law; on the terms described hereafter;

3.  The CPUC may not conduct any *Pike County* review with respect to PG&E's wholesale power purchase costs covered by its First Claim; and

4.  Any *Pike County* review with respect to the wholesale power purchase costs covered by PG&E's Second Claim must be limited to review of whether PG&E prudently entered into certain bilateral wholesale power procurement contracts after August 3, 2000, when the CPUC granted PG&E authority to enter into such contracts.

PG&E also requests entry of a permanent injunction requiring defendants to comply with the terms of any declaratory order entered by this Court, and entry of final judgment in favor of PG&E on PG&E's First and Second Claims for Relief in its Complaint pursuant to Fed. R. Civ. P. 54(b).

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

By this motion, PG&E seeks entry of judgment on its First and Second Claims, which allege that the CPUC's refusal to allow PG&E to recover billions of dollars of FERC-tariffed wholesale power and transmission costs violates federal preemption principles.  The central legal premise that underpins this lawsuit is incontrovertible:  Federal law requires a state, in setting a utility's retail rates, to allow the utility to recover its FERC-tariffed wholesale costs from its retail customers.  By and large, the CPUC does not dispute that well-established principle.  Instead, the CPUC asserts that it has fully complied with the filed rate obligation by adopting its *Interim Opinion Regarding Proposed Rate Increases*, D.01-03-082 (Mar. 27, 2001) (the "Acct'g Order"), attached to Request For Judicial Notice as Exhibit 12 ("RJN Exh. __").  In brief, the Order adopted an accounting change proposed by TURN, requiring PG&E to retroactively restate its books going back to January 1, 1998, moving certain historical financial entries from one account to another.  These bookkeeping changes retroactively "offset" PG&E's 2000-2001 power costs undercollection against revenues recorded from January 1998 forward from various sources such as, *e.g.*, the gain on sales of PG&E's power plants made years ago.  By entering the Acct'g Order the CPUC purports to have eliminated PG&E's $8.3 billion undercollection.  The question for this Court, then, is whether the CPUC's adoption of the Acct'g Order satisfies the requirements of the filed rate doctrine.  We submit that, once the Acct'g Order is deconstructed beyond the CPUC's superficial and conclusory assertion that PG&E has "recovered" its costs, that question must be answered in the negative.  Any other result would allow any state to avoid federal law by adopting a similarly empty rate order, rendering the filed rate doctrine meaningless.

As an initial matter, we offer what should be the unexceptionable proposition — although the CPUC repeatedly has taken exception to it — that the answer to this question must be supplied by federal, and not state, law.  Despite the fact that the State elected to adopt a novel market restructuring, its actions in all regards continue to be subordinate to overarching federal imperatives, including preemption principles.  It is no answer to PG&E's lawsuit for the CPUC to say, in effect, "AB 1890 created a unique rate freeze design, and thus we are entitled to interpret the operation of that rate design in any way we see fit."  Although the AB 1890 scheme is one among many different state blueprints for retail markets and ratemaking, it, no less than others, must comply with the federal law.  However

PG&E'S MOTION FOR SUMMARY JUDGMENT
C 01-03023 VRW

1   PG&E's undercollection came about, the circumstance of a utility bearing wholesale costs that exceed

2   its retail rates is hardly unique, and decades of filed rate jurisprudence supply unambiguous answers to

3   how that problem must be remedied by the State.

4          Next we observe that the CPUC's argument elevates regulatory form over economic substance.

5   The Acct'g Order had no actual economic effect, as the historic revenues which the CPUC used to

6   "offset" PG&E's power costs were either regulatory accounting entries that did not reflect any cash

7   receipts by the utility, or had long since been spent on PG&E's legitimate business purposes, such as

8   payments for purchased electricity, income taxes, and shareholder dividends.  Thus the Order did

9   nothing more than net historic revenue entries recorded in PG&E's regulatory accounts against PG&E's

10  more recent wholesale costs.  But the filed rate doctrine is not concerned with regulatory accounting

11  conventions.  Rather, it is intended to avoid the economic consequences for a utility of being forced on

12  an ongoing basis to pay out for FERC-tariffed costs more than it takes in through retail rates.  This focus

13  on economic substance is reflected in one federal court's explanation of the doctrine's underlying

14  rationale:  "No electric utility can long survive if its retail rates produce less revenue than it has to pay to

15  purchase the power delivered to its retail customers."  *Public Serv. Co. v. Patch,* 87 F. Supp. 2d 57, 64

16  (D. N.H.) , *aff'd,* 221 F. 3d 198 (1st Cir. 2000).  That observation proved prescient here, where the

17  CPUC's Acct'g Order did nothing to halt PG&E's slide into bankruptcy.

18         We move, then, to the particular.  Far from delivering the *coup de grâce* to PG&E's preemption

19  claims, the Acct'g Order fails to comply with the filed rate obligation in several respects.  *First*, the

20  Order purports to apply revenues from sources such as, *inter alia*, gain on sale of PG&E's power plants,

21  to "offset" wholesale power costs.  However, the law is clear that the CPUC must treat PG&E's FERC-

22  tariffed costs as current operating expenses which must be recovered in retail rates, not from collateral

23  revenue sources.  *See, e.g., Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 969 (1986) ("The

24  FERC-approved rate at which the middleman purchased power" must be "fully recognized as a cost in

25  the retail market."); *Mississippi Power & Light Co. v. Mississippi*, 487 U.S. 354, 372 (1988) ("*MP&L*")

26  ("States may not bar regulated utilities from *passing through to retail consumers* FERC-mandated

27  wholesale rates."); *see also* 10-12, 15-17, *infra*.

28         *Second*, the CPUC's attempt to reach back in time four years and recapture PG&E's profits from

2

PG&E'S MOTION FOR SUMMARY JUDGMENT
C 01-03023 VRW

prior periods to cancel out current operating costs is also illegitimate. Utility ratemaking may only be conducted prospectively, not retroactively. As the Supreme Court has held, "[p]rofits of the past cannot be used to sustain confiscatory rates for the future." *Board of Public Util. Comm'rs v. New York Tel. Co.*, 271 U.S. 23, 32 (1926). The CPUC contends that the unique deregulatory scheme established by AB 1890 somehow alters normal ratemaking principles and gives the CPUC latitude to spread PG&E's 2000-2001 power costs back over the entire transition period, starting on January 1, 1998, so as to give the appearance that those costs had been fully recovered, albeit solely on paper. However, nothing in the substantial body of filed rate precedent even hints at a basis for crafting such an exemption from normal preemption principles. Here, as in any other filed rate case, the CPUC's obligation is to allow wholesale cost recovery on a prospective, ongoing basis. *See* 17-18, *infra*.

*Third*, a portion of PG&E's historic revenues since January 1998 did derive from retail rates. Under AB 1890, California utilities were entitled to collect retail rate revenues in excess of their actual operating costs plus an ordinary rate of return, known as "headroom," and to use that headroom to recover their historic capital investments, or "stranded costs." Prior to the onset of the energy crisis in June 2000, PG&E had collected headroom in the amount of $2.75 billion. The Acct'g Order "offsets" that historic headroom against PG&E's 2000-2001 wholesale costs undercollection, just as it does the other non-rate revenues that PG&E recorded over the past four years. The fact that headroom revenues came from retail rates does not legitimize that aspect of the Acct'g Order. Here, too, the CPUC is bound to conduct its ratemaking prospectively, not retroactively. Sound equitable considerations support that result. The dollars that PG&E took in between 1998 and the beginning of the energy crisis, including headroom revenues, were not available to pay for the wholesale costs incurred later. PG&E utilized its past revenues for settled transactions upon which it and numerous third parties have relied, which obviously cannot be unwound in order to allow PG&E to recover its undercollection. *See* 18-19, *infra*.

Finally, the CPUC repeatedly has argued that summary judgment is premature, on the ground that it needs extensive discovery before these claims may be resolved. PG&E emphatically disagrees. By and large, the preemption issues raised by PG&E's claims and the CPUC's defenses are pure questions of law. The salient facts — *e.g.*, operation of the California market, PG&E's FERC-tariffed wholesale costs, its undercollection, and the terms of the Acct'g Order — are all undisputed and largely

3

1  judicially noticeable.  The CPUC claims that discovery is necessary to establish the so-called "*Pike*

2  *County*" exception to the filed rate doctrine.[1]  PG&E does not dispute, as a general matter, that the *Pike*

3  *County* exception has been recognized by some courts.  However, whether and to what extent the CPUC

4  may conduct a *Pike County* review here may be determined as a matter of law based on indisputable

5  facts about PG&E's limited procurement alternatives, all of which were prescribed by CPUC directive

6  and therefore are as well-known to the CPUC as to PG&E.  No factual impediment exists to resolution

7  of the issues posed by this motion.  And, in any event, the scope of any permissible *Pike County* review

8  is sharply limited by:  (i) the Ninth Circuit's opinion in *In re California Power Exchange Corp*., 245

9  F.3d 1110, 1114-15 (9th Cir. 2001), in which the court recognized that California utilities' purchases of

10  electricity in the PX and ISO markets had been held "presumptively prudent" by the CPUC; and (ii) the

11  filed rate doctrine, which prohibits the CPUC from theorizing about the prices PG&E purportedly would

12  have paid for power had it bid its load into the PX and ISO markets differently.  *See Transmission*

13  *Agency  v. Sierra Pacific Power Co. ("TANC")*, 2002 WL 553845 (9th Cir. Apr. 16, 2002), RJN Exh.

14  38; Decl. of Jonathan Falk (NERA economist) ("Falk Decl.") (Apr. 18, 2002); *see also* 21-25, *infra*.

15  **II.    STATEMENT OF FACTS**

16        **A.    Electric Industry Regulation Under California Law**

17             **(1)    Electric Industry Restructuring Under AB 1890**

18        In 1996, California enacted AB 1890, which restructured the State's electric industry by

19  permitting new market entrants to compete against the incumbent public utilities for the generation and

20  sale of electricity in California.  *See* Pub. Util. Code § 330(d).  Under AB 1890, California's investor-

21  owned utilities ("IOUs") remain obligated to provide default bundled utility service to all customers who

22  do not choose to buy electricity elsewhere.  That function includes buying wholesale electric power for

23  resale to  retail customers on a purely cost pass-through basis.  *See, e.g*., *id*. §§ 330(r), 451, 761; *see also*

24  Decl. of M. Christie McManus ("McManus Decl.") (Apr. 18, 2002) (more complete statement of facts).

25  _____

26      [1]  *Pike County* allows a state to inquire into the prudence of a utility's purchases of federally-
tariffed power from one source when lower-cost alternative sources were available.  *Pike County Light*

27  *& Power Co. v. Pennsylvania Pub. Util. Comm'n*,  465 A.2d 735, 737-38 (Pa. Commw. Ct. 1983).  The
Supreme Court has reserved judgment on whether such an exception to the filed rate doctrine even

28                                               *(Footnote continued)*

PG&E'S MOTION FOR SUMMARY JUDGMENT
C 01-03023 VRW

To safeguard existing utilities, AB 1890 provided a process to enable utilities to compete on a level playing field against new market entrants unencumbered by unamortized historic costs.[2] During a several years-long "transition period," a retail rate freeze was adopted. *Id.* §§ 330(s), 367(a), 368(a). The rate freeze period was designed to benefit utilities by setting rates "in a way that accelerate[s] payoffs of the capital costs of utility power plants by permitting the utilities to 'freeze' artificially high rates and use revenues exceeding costs to pay down capital investment." *California's Elec. Options and Challenges*, Report to Gov. Gray Davis, by Elec. Oversight Board & CPUC ("CPUC Report") at 16, RJN Exh. 48.[3] The revenues from frozen retail rates above costs and ordinary rates of return are referred to as "headroom." AB 1890 provided for a number of revenue sources in addition to headroom for the utilities to recover their historic investment costs (*see* McManus Decl. ¶ 7):

- ***Sale or valuation of generation assets***: AB 1890 required the utilities either to sell or appraise their generation assets as a mechanism for recovering their past investment costs. Proceeds from the sale of generation assets (or the market value of retained assets) would be applied against their book value. Any portion of book value above sales price or market value would be deemed "uneconomic" (*i.e.*, a CTC), for recovery from headroom and the other revenue sources identified immediately below. In the case of asset valuation, with no actual associated sale, the valuation resulted simply in an accounting entry to be applied to the asset's book value. *See* Pub. Util. Code § 367(b).

- ***Revenue from rate reduction bonds***: AB 1890 authorized the issuance of "rate reduction bonds," revenue from which was to be used solely for the recovery of historic investment costs. *See* Pub. Util. Code §§ 840-47.

- ***Market value of the utilities' own generated electricity***: The CPUC directed that the market value in excess of costs of the electricity generated by the utilities' own power plants and sold into the PX, as required by the CPUC, be recorded as "revenue" and applied to recovery of the utilities' historic investment costs. However, because PG&E was never paid for this electricity, these sales resulted in no receipt of cash by PG&E. *See* McManus Decl. ¶ 7.

### (2)    The California Wholesale Electricity Markets

With FERC approval, AB 1890 created two markets on which wholesale electricity was to be

---

exists. *MP&L*, 487 U.S. at 373-74; *Nantahala*, 476 U.S. at 972.

[2] These historic costs recoverable under AB 1890 — for example, shareholder investments made to construct power generating facilities — are referred to as "stranded costs" or as "competition transition charges" ("CTCs").

[3] Each utility's rate freeze ended when the utility completed recovery of its CTCs, or on March 31, 2002, whichever was earlier. Pub. Util. Code § 368(a). In other proceedings, PG&E contends that it satisfied conditions for the end of its rate freeze in April 2000 and that its rate freeze ended no later than

*(Footnote continued)*

PG&E'S MOTION FOR SUMMARY JUDGMENT
C 01-03023 VRW

bought and sold in California, and in which the CPUC required California IOUs to buy all of their power:  The Power Exchange ("PX") and the Independent System Operator ("ISO").  Before it ceased operations, the PX acted as an auction clearinghouse, operating several markets in which it matched bids for the purchase and sale of wholesale electricity, including the "day-ahead" market (for sales of electricity a day ahead of delivery) and the "day-of" market (for electricity sales on the day of delivery). Starting in July 1999, a division of the PX — CalPX Trading — also operated a Block Forward Market ("BFM"), an exchange that matched bids to buy specified amounts of power for various time periods with offers sell power for the same periods in advance of the contracted delivery date.  The ISO, which continues in operation, controls the transmission grid in California, and also has responsibility for purchasing wholesale electricity to meet demand not scheduled beforehand.  As of August 2000, the CPUC authorized California IOUs to purchase a limited amount of wholesale electricity through bilateral contracts.  *See generally* Decl. of Kermit R. Kubitz ("Kubitz Decl.") ¶¶ 4-9 (Apr.18, 2002) (market descriptions); Falk Decl. ¶¶ 4-5, 7-21, 24-26 (same).

### (3)     Regulatory Accounts Used to Track Purchases of Wholesale Electricity, and Other Costs and Revenues:  The TRA and TCBA

The CPUC directed the utilities to set up two new regulatory accounts to track certain cost recoveries and revenues during the rate freeze period:  The Transition Revenue Account ("TRA") and the Transition Cost Balancing Account ("TCBA").  The TRA was designed to record the utilities' costs and revenues associated with providing electricity to retail customers.  The costs of purchasing wholesale electricity through the PX and ISO, transmission, distribution, and certain other costs were recorded in the TRA, as were the revenues from the frozen retail rates prescribed by AB 1890.  *See Order Instituting Rulemaking*, D.97-10-057, 1997 Cal. PUC LEXIS 988, at *12, *45-*46 (Oct. 22, 1997), RJN Exh. 25.  Until issuance of the Acct'g Order (*see infra* Section II(D)), to the extent retail rate revenues were insufficient to cover procurement and other costs (*i.e.*, there was no headroom), the shortfall was accumulated in the TRA as an "undercollection" and was carried over to later months for recovery from headroom (if available).  *See* CPUC Resolution E-3527, 1998 Cal. PUC LEXIS 1027, at *14-17 (Nov. 19, 1998), RJN Exh. 49.  The TCBA was designed to record the utilities' recovery of

August 2000.  *See* McManus Decl. ¶ 8.

PG&E'S MOTION FOR SUMMARY JUDGMENT
C 01-03023 VRW

stranded costs (or CTCs).  The initial "balance" in the TCBA was the total amount of the utilities' unrecovered historic investment costs.  The "revenues" recorded in the TCBA came from the sources identified in Section II(A)(1) above:  Asset sale or valuation, proceeds from the issuance of rate reduction bonds, market value of the utilities' own generated electricity, and headroom.  *See In re PG&E*, D.97-06-060, 1997 Cal. PUC LEXIS 231, at *21, *98 (June 11, 1997), RJN Exh. 26.  The TRA and TCBA are creatures of regulatory accounting and are distinct from the financial accounting which describes PG&E's actual financial condition.  *See* McManus Decl.¶¶ 11-17 (extended description of TRA and TCBA); Decl. of Walter M. Campbell ("Campbell Decl.") ¶ 4 (Apr. 18, 2002) (TCBA revenues).

### (4)    The CPUC's "PTER" Decisions

The CPUC has interpreted AB 1890 to preclude California's IOUs from recovering *after* the rate freeze any wholesale electricity procurement costs that the utilities were unable to recover through retail rates *during* the rate freeze.  In "Post Transition Electric Ratemaking" ("PTER") proceedings, PG&E proposed to the CPUC, among other things, establishment of accounting mechanisms that would have allowed PG&E to recover any undercollected amounts recorded in the TRA, including power procurement costs, after the rate freeze ended.  In Decision 99-10-057, the CPUC denied PG&E's application, stating that AB 1890 does "not permit the utilities to carry over after the rate freeze those costs incurred during the rate freeze."[4]

### B.    PG&E's Purchases of Wholesale Electricity

### (1)    All of PG&E's Purchases of Wholesale Electricity and Costs of Transmission at Issue in this Case Were Incurred Pursuant to Federally-Filed Tariffs.

All of PG&E's wholesale electricity procurement and transmission costs since the start of the restructured California electricity markets in 1998 were incurred pursuant to tariffs filed with FERC:

- All of PG&E's purchases of wholesale electricity from the PX were made pursuant to a tariff filed at

---

[4] *Interim Decision re PG&E*, D.99-10-057 at 36 (Oct. 21, 1999), RJN Exh. 21; *see also id.* at 15 (During AB 1890 rate freeze period, "utility must live with the revenues it receives, which fluctuate according to sales.  AB 1890 does not provide exceptions to the rate freeze on the basis that the utility may not have collected all the revenues it anticipated or failed to recover otherwise reasonable costs."); *Order Granting Limited Rehearing of D.99-10-057,* D.00-03-058 (Mar. 16, 2000), RJN Exh. 19.

PG&E'S MOTION FOR SUMMARY JUDGMENT
C 01-03023 VRW

FERC by the PX (the "PX Tariff");

- All of PG&E's purchases of wholesale electricity from the BFM were made pursuant to a tariff filed at FERC by CalPX Trading Services (the "BFM Tariff");

- All wholesale electricity purchased for PG&E's customers through the ISO and all of PG&E's transmission costs were made pursuant to a tariff filed at FERC by the ISO (the "ISO Tariff");

- All of PG&E's purchases of electricity under bilateral contracts were pursuant to tariffs filed at FERC by the sellers or marketers of electricity with which PG&E entered into those contracts.

*See* Kubitz Decl. ¶¶ 21-33 (Apr. 18, 2002) (tariff descriptions) and RJN Exhs. 28-37 (tariffs). These tariffs incorporate what are known as "market-based" rates because the tariffs provide that rates result from market processes, either supply and demand bidding resulting in clearing prices (PX and ISO) or prices negotiated between parties (bilateral contracts).

### (2)    The CPUC Repeatedly Has Declared That PG&E's PX and ISO Purchases Were Conclusively Reasonable and Not Subject to "Prudence" Review.

From its first order establishing a roadmap for the restructuring regime, the CPUC repeatedly and explicitly has held that the mandated purchases made by California's IOUs from the PX markets and the ISO would be considered conclusively reasonable, and not subject to retroactive "prudence" review under the so-called "*Pike County*" exception to the filed rate doctrine. The CPUC has reaffirmed this guarantee at every important juncture in the market's development, holding at various times that, "We deem the prices paid [in the PX and ISO markets] as reasonable"; "all PX purchases during the rate freeze are deemed reasonable"; "purchases through the PX were per se reasonable"; "reasonableness attached" to all PX products; and that BFM purchases are "deemed prudent." The CPUC's numerous official statements to this effect and their record cites are set forth in Appendix A attached hereto.

### C.    The Wholesale Electricity Market Crisis

In June 2000, wholesale prices for electricity skyrocketed, forcing PG&E to pay out far more to purchase electricity at federally-prescribed prices than its frozen retail rates were bringing in. As power procurement costs vastly exceeded the amounts PG&E received in retail rates, the amount of PG&E's undercollection swelled, to approximately *$8.3 billion* by the end of January 2001. Because the CPUC refused to allow PG&E to recover its undercollection in retail rates, PG&E was forced to amass crippling debt to finance the costs of buying electricity for its customers, whom it was legally obligated to serve. In January 2001, Moody's and Standard and Poor's lowered PG&E's credit rating to below

8

1   investment grade.  After those downgrades, PG&E was unable to obtain further financing for its power

2   purchases.  As PG&E's credit ratings fell, its banks refused to make further loans, leaving PG&E unable

3   to pay maturing commercial paper or invoices for wholesale power purchases as they came due.  PG&E

4   ultimately was forced to file for Chapter 11 bankruptcy protection on April 6, 2001.  *See* Campbell Decl.

5   ¶ 8 (PG&E's financial decline); McManus Decl. ¶¶ 26-29 & *Review of PG&E Financial Condition for*

6   *the CPUC,* by Barrington-Wellesley, Inc. (Jan. 30, 2001) (Attached to McManus Decl. as Exh. C.).

7       **D.      The Acct'g Order:  The CPUC's Refusal to Provide Meaningful Rate Relief**

8           Since the energy crisis began, PG&E repeatedly has sought rate relief from the CPUC.  On

9   January 4, 2001, following months of unheeded petitioning by PG&E, the CPUC rendered a decision

10  acknowledging that PG&E was on the brink of financial collapse, and ordered a 1¢ "Emergency

11  Procurement Surcharge" to pay for future (but not past) procurement costs.  *Interim Opinion Re*

12  *Emergency Reqs. for Rate Increases*, D.01-01-018 (Jan. 4, 2001), RJN Exh. 14.  On March 27, 2001, the

13  CPUC issued a decision authorizing an additional 3¢/kWh retail rate surcharge for future (but again, not

14  past) procurement costs.  Acct'g Order, RJN Exh. 12.  McManus Decl. ¶¶ 25, 28.

15          The Acct'g Order also adopted a proposal by TURN retroactively to change the CPUC's

16  regulatory accounting rules for PG&E and SCE so as to make it appear that the utilities had recovered

17  their wholesale procurement cost undercollections.  The Acct'g Order required PG&E retroactively to

18  restate its TRA and TCBA balances from January 1, 1998, forward by transferring on a monthly basis

19  the balance in the TRA, whether positive or negative, to the TCBA.  The Order purports to eliminate

20  PG&E's multibillion undercollection because the negative balances (*i.e.*, undercollections) in the TRA,

21  when transferred to the TCBA, are offset on paper by all of the historic revenues recorded in the TCBA

22  (*e.g.*, by gains on sale of PG&E's power plants).  PG&E has challenged the legal validity in state court,

23  under state law, of the Acct'g Order's purported retroactive reshuffling of years-old accounting entries.[5]

24  As an economic matter, the Acct'g Order does not eliminate the massive shortfall between the wholesale

25  electricity costs that PG&E has incurred and the amount of PG&E's retail rate revenues available to pay

26  ───────────────

27      [5] PG&E's writ petition in the California Court of Appeal reserves its challenges to the Acct'g
    Order under federal law for federal court review pursuant to *England v. Louisiana State Bd. of Med.*

28                                          *(Footnote continued)*

                                        9

for those costs.  The Acct'g Order does not yield a single incremental dollar for PG&E to pay its undercollected wholesale procurement costs.  Indeed, after issuance of the Order, PG&E's standing in the market sank further.  *See* McManus Decl. ¶¶ 30-34 (Acct'g Order's operation); Campbell Decl. ¶ 8.

The Acct'g Order rests on numerous false assumptions regarding the availability of "revenues" that can be "applied" to pay for the undercollection.  In the first place, a large component of "revenue" recorded in the TCBA — the market value of PG&E's own generated electricity in excess of costs — was required to be recorded as revenue pursuant to the CPUC's regulatory accounting directives, but reflects no cash receipts by PG&E because PG&E was never paid for those electricity sales.  In addition, the revenues recorded in the TCBA from the sale of generation assets and from the issuance of rate reduction bonds are statutorily earmarked exclusively for the recovery of stranded costs, and cannot be applied to recovery of procurement costs.[6]  Even if it were limited to application of actual cash revenues, the Acct'g Order rests on the further false assumption that cash received years ago is available to pay for PG&E's undercollected procurement costs.  PG&E long ago used cash it received prior to the start of the energy crisis in June 2000 for disclosed business purposes, without objection by the CPUC, including payments for purchased wholesale electricity, federal and state income taxes, shareholder dividends and debt retirement.  *See* Campbell Decl. ¶¶ 4-7 (details of PG&E's application of cash to costs).

## III.    LEGAL ARGUMENT

### A.    The Basic Contours of the Filed Rate Doctrine Are Not Open to Dispute.

The filed rate doctrine has been the subject of extensive judicial discussion, including frequent attention from the United States Supreme Court, for eight decades, since Justice Brandeis first announced the doctrine in *Keogh v. Chicago & Northwestern Ry. Co.*, 260 U.S. 156 (1922).  Its fundamental premise is simple.  To borrow from Gertrude Stein, "a rate is a rate is a rate."  Once a rate is filed with a federal agency having regulatory authority over the subject area, the rate becomes binding on all parties for all purposes, and cannot be questioned or altered except by the relevant federal agency.

*Examiners*, 375 U.S. 411 (1964).

---

[6] *See* Pub. Util. Code § 367(b) (market valuation from the sale of "utility-owned generation-related assets" shall be used to offset the utility's historic investment costs); *id*. § 840(e) (the proceeds of rate reduction bonds "are used to provide, recover, finance or refinance *transition costs* and to acquire

*(Footnote continued)*

PG&E'S MOTION FOR SUMMARY JUDGMENT
C 01-03023 VRW

1    *See TANC*, 2002 WL 553845 (9th Cir. Apr. 16, 2002), at *7, RJN Exh. 38.

2    **(1)    The Filed Rate Doctrine Consists of Two Complementary Strands.**

3    Two companion prohibitions lie at the core of the filed rate doctrine.  The first, an application of

4    federal preemption principles, forbids a state regulatory agency, in setting a utility's retail rates, from

5    denying the utility recovery of costs incurred pursuant to tariffed wholesale rates (or "filed rates") that

6    were filed with a federal agency acting in its exclusive jurisdiction — here, the FERC.  *Nantahala*, 476

7    U.S. at 962-67; *MP&L*, 487 U.S. at 370-73; *Montana-Dakota Utils. Co .v. Northwestern Pub. Serv. Co*.,

8    341 U.S. 246, 251 (1951).  The second or "non-justiciability" principle prohibits both courts and state

9    agencies from theorizing as to what a "just and reasonable" rate might have been under circumstances

10   different than those that led to the tariffed rates actually paid by the utility.  *See Montana-Dakota*, 341

11   U.S. at 250-52 (a court "can assume no right to a different [rate] on that ground that, in its opinion, it is

12   the only or the more reasonable one").  Both aspects of the filed rate doctrine come into play here.

13   **a.    The "Preemption" Strand**

14   PG&E's motion for summary judgment is premised on the filed rate principle that a state, in

15   setting retail rates, must allow utility costs incurred as a result of a FERC-regulated wholesale

16   transaction to be recognized as legitimate operating expenses and be passed through to retail customers.

17   "When FERC sets a rate between a seller of power and a wholesaler-as-buyer, a State may not exercise

18   its undoubted jurisdiction over retail sales to prevent the wholesaler-as-seller from recovering the costs

19   of paying the FERC-approved rate. . . . *Such a "trapping" of costs is prohibited*."  *Nantahala*, 476 U.S.

20   at 970 (emphasis added).  In *Nantahala*, the Supreme Court applied the filed rate doctrine to bar a state

21   utilities commission from disallowing utility costs flowing from a FERC-approved contract, which

22   allocated a supply of inexpensive electric power between affiliated companies.  In setting Nantahala's

23   retail rates, the state commission concluded that it should have obtained more of the inexpensive power

24   than was allocated to it by the FERC-approved contract, and re-calculated Nantahala's power costs

25   based on that assumption.  The effect was to prevent the utility from recovering its full power purchase

26   costs in retail rates.  The Supreme Court reversed on the ground that the filed rate doctrine prevented the

27   _____

28   transition property . . .") (emphasis added); *see also id*. §§ 840(d), (g).

11

1  commission from setting retail rates based on any assumed allocation of power other than that reflected

2  in the FERC-approved contract. *Nantahala*, 476 U.S. at 966-67.

3        Two years later, in *MP&L*, the Supreme Court reaffirmed that "States may not bar regulated

4  utilities from passing through to retail consumers FERC-mandated wholesale rates." 487 U.S. at 371-

5  72. A group of affiliated power companies, including MP&L, had jointly constructed the Grand Gulf

6  nuclear power facility and allocated amongst themselves its construction and operation costs in an

7  agreement filed with the FERC. The Mississippi Supreme Court ruled that MP&L's retail rates could

8  not be raised to reflect the costs flowing from the allocation until the state's utility commission

9  conducted a prudence review of MP&L's decision to participate in the Grand Gulf project. *Id.* at 366-

10  68. The Supreme Court reversed, and held that the filed rate doctrine compelled the state to "treat

11  MP&L's FERC-mandated payments for Grand Gulf costs as reasonably incurred operating expenses for

12  the purpose of setting MP&L's retail rates." *Id.* at 369-70. For a state public utility commission to

13  second-guess rates or agreements filed with the FERC would usurp "a function that Congress has

14  assigned to a federal regulatory body. This the Supremacy Clause will not permit." *Arkansas Louisiana*

15  *Gas Co. v. Hall* ("*Arkla*"), 453 U.S. 571, 582 (1981).

16        The Ninth Circuit likewise recognizes, as it must, the binding effect of federally-approved rates

17  and tariffs on retail ratemaking by a state utility commission. *See County of Stanislaus v. Pacific Gas*

18  *and Elec. Co.*, 114 F. 3d 858, 865-66 (9th Cir. 1997) (because the Department of Energy and the FERC

19  had approved PG&E's challenged wholesale costs, PG&E's costs were "conclusively reasonable," could

20  not be contradicted by a court and were "*not subject to question by the CPUC*") (emphasis added).

21  Here, this application of the filed rate doctrine bars the CPUC from disallowing PG&E's recovery of its

22  full electricity procurement and transmission costs because such costs were incurred under tariffs filed

23  with and regulated by the FERC.

24          **b.**    **The "Non-Justiciability" Strand**

25        Ratemaking is a legislative function, performed by an agency acting in a quasi-legislative

26  capacity pursuant to its statutorily-delegated authority. *Arizona Grocery Co. v. Atchison, Topeka and*

27  *Santa Fe Ry. Co.*, 284 U.S. 370, 389 (1932). Thus, the determination of what constitutes a reasonable

28  wholesale rate rests exclusively in the province of the federal agency acting in its exclusive jurisdiction,

12

PG&E'S MOTION FOR SUMMARY JUDGMENT
C 01-03023 VRW

1   and is a non-justiciable issue in the courts.  *Keogh*, 260 U.S. at 163-64.  This so-called non-justiciability

2   strand has just been thoroughly examined by the Ninth Circuit in the *TANC* case, which held that "the

3   filed rate doctrine prohibit[s] not just [a state or federal court] from setting a rate different from that

4   chosen by FERC, *but also from assuming a hypothetical rate different from that actually set by FERC*."

5   2002 WL 553845, at *8 (emphasis added), RJN Exh. 38.  *See also Fax Telecomm. Inc. v. AT&T*, 138

6   F.3d 479, 489 (2d Cir. 1998 (filed rate doctrine "recognizes that (1) legislatively appointed regulatory

7   bodies have institutional competence to address ratemaking issues; (2) courts lack the competence to set.

8   . . rates; and (3) the interference of courts in rate-making process would subvert the authority of rate-

9   setting bodies and undermine the regulatory regime").  In this case the "non-justiciability" principle

10  limits the scope of any reasonableness review the CPUC may lawfully conduct into the prudence of

11  PG&E's wholesale power purchases.  Specifically, neither this Court nor the CPUC may theorize as to

12  what wholesale rates might have been produced in the PX and ISO markets had PG&E employed

13  different load bidding strategies.  *See* 22-24, *infra*.

14              **(2)    The Filed Rate Doctrine Applies to Market-Based Rates.**

15              The filed rate doctrine applies to market based rates, such as those PG&E paid under the PX and

16  ISO tariffs.  The FERC's acceptance of the PX and ISO tariffs for filing is conclusive, for purposes of

17  this litigation, on the validity of those tariffs and the requirement that the State permit recovery of the

18  resulting costs in retail rates.  The Ninth Circuit recently eliminated any doubt about the issue, holding

19  that the filed rate doctrine applies to the market-based PX tariffs under which PG&E bought wholesale

20  power in California.  *Duke Energy Trading & Marketing, L.L.C. v. Davis*, 267 F.3d 1042, 1056-57 (9th

21  Cir. 2001) ("CalPX operated pursuant to FERC-approved rate schedules and tariffs," to which filed rate

22  doctrine applies), *pet. for cert. filed*, 70 USLW 3580 (Mar. 5, 2002).  *See also* Order Granting Mot. to

23  Dismiss, *Campbell v. San Diego Gas & Elec. Co.*, No. CV-00-2382-RHW (E.D.Wa. Sep. 19, 2001),

24  RJN Exh. 40 (same California market-based tariffs at issue here are subject to filed rate doctrine).

25  Given these holdings, it cannot credibly be argued that the market-based rate structure of the PX and

26

27

28

13

ISO tariffs exempts them from the strictures of the filed rate doctrine.[7]

### (3)    The Filed Rate Doctrine Applies Irrespective of Whether the CPUC's Actions "Conflict" with the Federal Wholesale Market Regulatory Scheme.

Defendants and TURN have, to date, operated under the fundamental misconception that the CPUC's orders must actually conflict with FERC orders or tariffs in order for preemption to arise under the filed rate doctrine. The Supreme Court's decision in *MP&L*, however, flatly rejects any notion that the scope of federal vs. state jurisdiction over power regulation is determined by conflicts preemption, holding instead that field preemption applies:

> The Mississippi Supreme Court erred in adopting the view that the pre-emptive effect of FERC jurisdiction turned on whether a particular matter was actually determined in the FERC proceedings…We have long rejected this sort of 'case-by-case analysis of the impact of state regulation upon the national interest' in power regulation cases. Congress has drawn a bright line between state and federal authority in the setting of wholesale rates . . . States may not regulate in areas where FERC has properly exercised its jurisdiction to determine just and reasonable wholesale rates . . . .

487 U.S. at 374. *See also FPC v. Southern Cal. Edison Co.*, 376 U.S. 205, 215-16 (1964) (same); *Duke Energy*, 267 F. 3d at 1058 (rejecting argument that there must be conflict between state and federal regulations for preemption to apply: "Governor Davis contends that 'the proper focus is not whether there is a conflict with the tariffs, but whether there was a conflict between the state and federal schemes.' The filed rate doctrine belies this assertion.").[8]

---

[7] *See also CPUC v. FERC*, 254 F.3d 250, 254 (D.C. Cir. 2001) ("It can hardly be doubted at this late date that the [FERC] need not confine rates to specific absolute numbers but may approve a tariff containing a rate 'formula' or a rate 'rule.'"); *Town of Norwood v. New England Power Co.*, 202 F.3d 408, 419 (1st Cir. 2000); *Transwestern Pipeline Co. v. FERC*, 897 F.2d 570, 578 (D.C. Cir. 1990) (FERC "need not confine rates to specific, absolute numbers but may approve a tariff containing a rate 'formula' or a rate 'rule'"). And the FERC, charged with exclusive authority to interpret and apply the FPA, has held conclusively that the filed rate doctrine applies to the California PX and ISO market-based tariffs. *San Diego Gas & Electric Co.*, 96 FERC ¶61,120, at 61,506 (July 25, 2001), RJN Exh. 1 ("the filed rate doctrine applies to the [California PX and ISO] market-based rates at issue here").

[8] As a corollary, the CPUC and TURN have asserted that FERC has approved or adopted AB 1890's retail rate freeze into the PX or ISO tariff provisions under which PG&E incurred its power costs. Not only is that argument wrong as a matter of law, but the FERC itself has expressly disclaimed approval of the rate freeze on several occasions, including in a letter from the FERC Chairman to Congress commenting on PG&E's litigation: "[W]ith respect to the specific question of Commission approval of a retail rate freeze, *the Federal Power Act does not give the Commission jurisdiction over rates for sales of electric energy to retail customers, and therefore none of the Commission's orders involving California restructuring can properly be interpreted as authorizing any particular level of retail rates in California*." Letter from Curt Hébert to Doug Ose of 4/6/01 at 3, RJN Exh. 43.

**B.    The CPUC's Acct'g Order Does Not Satisfy the Filed Rate Mandate.**

As demonstrated above, there is no legitimate basis for doubting that PG&E's FERC-tariffed costs for wholesale power and transmission are subject to the filed rate doctrine. Federal law plainly prohibits the CPUC from disallowing recovery by PG&E of such costs. The CPUC not only does not dispute that basic premise, but has publicly admitted it to be true.[9] Rather than contesting the applicability of the core preemption principle, the CPUC contends that its Acct'g Order fully satisfies the requirements of the filed rate doctrine. However, the Order fails to satisfy the essential purpose of the filed rate doctrine, which is to provide certainty to utilities about the economic consequences of their wholesale energy purchases and re-sale to retail customers.[10] As discussed earlier, once one moves beyond the CPUC's superficial assertion that PG&E's costs have been "recovered," several subsidiary questions about the interplay between the filed rate doctrine and the Acct'g Order are revealed. All of those questions must be answered in PG&E's favor.

**(1)    May PG&E's Wholesale Costs Be Recovered From Collateral Sources of Revenue Which Are Not Derived From Retail Rates?**

Under the filed rate doctrine, it is well established that a utility must be permitted to recover its FERC-tariffed wholesale costs in retail rates paid by a utility's customers. In *Nantahala*, for example, the Court held that:

---

[9] In the CPUC's own words, "The federal 'filed rate doctrine' requires States to pass through to utility customers the costs of electricity that are purchased subject to federal tariffs. SDG&E's [San Diego Gas & Electric Company's] purchases [of electricity] are federally tariffed. Thus, the FERC ultimately controls how much SDG&E pays for wholesale power. *Whatever SDG&E pays for wholesale power, if allowed under a federal tariff, must by federal mandate be passed through to San Diego utility customers*." CPUC Report at 25, RJN Exh. 48. Although this statement refers to SDG&E, PG&E is in precisely the same position with respect to FERC's jurisdiction as SDG&E, in that PG&E purchases wholesale power pursuant to the very same FERC-approved tariffs as does SDG&E.

[10] *See, e.g.*, *Town of Concord v. FERC*, 955 F.2d 67, 75 (D.C. Cir. 1992) ("[T]he precise purpose[] of the filed rate doctrine . . . is 'providing the necessary predictability' . . . allowing 'purchasers of gas to know in advance the consequences of the purchasing decisions they make.'"); *Electrical Dist. No. 1 v. FERC*, 774 F.2d 490, 493 (D.C. Cir. 1985), *abrogated on other grounds*, *Transwestern Pipeline Co. v. FERC*, 897 F.2d 570 (D.C. Cir. 1990) ("wholesale purchasers of electricity cannot plan their activities unless they know the cost of what they are receiving, particularly if they are retailers, who must calculate their appropriate resale rates"); *Indiana & Michigan Electric Co. v. FPC*, 502 F.2d 336, 344 (D.C. Cir. 1974) (forcing retailers to absorb "out of their own current assets" wholesale procurement costs that cannot be passed on in retail rates would impose an unfair, significant economic burden not contemplated by the filed rate doctrine).

15

[A] state utility commission *setting retail prices must allow, as reasonable operating expenses, costs incurred as a result of paying a FERC-determined wholesale price* . . . . Once FERC sets such a rate, a State may not conclude in setting retail rates that the FERC-approved wholesale rates are unreasonable. . . . *[T]he rate increase in the cost of electricity . . . constitutes an actual operating expense and must so be viewed by the [state utility commission].*

476 U.S. at 965-66 (emphases added).[11]  Likewise, in *MP&L*, the Court held that the state commission was required "to treat [the utility's] FERC-mandated payments for Grand Gulf costs as reasonably incurred operating expenses *for the purposes of setting [the utility's] retail rates*" and that "States may not bar regulated utilities from *passing through to retail consumers* FERC-mandated wholesale rates." 487 U.S. at 369-70, 372 (emphases added).

Lower court decisions also define the filed rate doctrine as requiring recovery of wholesale costs through retails rates paid by retail customers.  *See, e.g.*, *Duke Energy*, 267 F. 3d. at 1056 ("the 'filed rate doctrine,' . . . in essence provides that 'interstate power rates filed with FERC or fixed by FERC *must be given binding effect*' by state authorities regulating *in areas subject to state jurisdiction, e.g., retail rates*") (emphasis added); *Public Serv. Co. v. Patch*, 221 F. 3d 198, 202 (1st Cir. 2000), *cert. denied*, 531 U.S. 1145 (2001) ("[T]he refusal of the state commission to allow the purchasing utility to pay the federal tariff rate, *and include that cost in its own rates*, is inconsistent with the federal scheme.") (emphasis added); *Kentucky West Va. Gas Co v. Pennsylvania Pub. Util. Comm'n*, 862 F.2d 69, 73-74 (3d Cir. 1988) ("The supremacy clause requires that utilities be permitted to pass through these costs to their retail customers in retail rates");[12] *Patch*, 87 F. Supp. 2d at 64-65 ("defendant must allow plaintiff

---

[11] *Nantahala* described the "typical application of the filed rate doctrine," in which "a middleman faces a FERC-fixed wholesale rate charged by a power supplier.  In that situation, for a state ratemaking agency to disregard a FERC-filed rate would clearly be inconsistent with the exclusive federal regulatory scheme over interstate wholesale power prices.  The FERC-approved rate at which the middleman purchased power *would not be fully recognized as a cost in the retail market*, thereby forcing the middleman to sell power at less than its reasonable cost as determined by the federal agency." *Id.* at 969 (emphasis added).

[12] The CPUC previously has mischaracterized *Kentucky West Va.* as standing for the proposition that the CPUC may look to all of a utility's costs and revenues over an indefinite time period  to ascertain whether wholesale costs have been recovered.  The actual holding of the case is merely that a state commission does not necessarily violate the filed rate doctrine if it delays passing through wholesale costs in retail rates for a short period of time, albeit *prospectively*, *id*. at 74-75, a result which affords the CPUC no help here.

16

to pass through its wholesale costs *to its retail customers* in New Hampshire").[13]  The FERC concurs in this interpretation of the doctrine.  *See*, *e.g.*, *Order Directing Remedies*, 93 FERC ¶ 61,294, 2000 FERC LEXIS 2491, at *59 n.37, RJN Exh. 2 (FERC's "wholesale rates must be considered just and reasonable for purposes of flow-through in retail ratemaking").  FERC Commissioner Massey came to the same conclusion in his concurrence:

> It seems rather clear to me that some day soon a federal court, if asked, will declare that the [California] utilities are entitled as a matter of federal preemption to recover these high wholesale costs from their customers.  That's the way I read applicable precedent such as *Nantahala*, *Narragansett [Electric Co. v. Burke]*, and *Mississippi Power & Light*.

*Id.* at *178-79 (citation omitted), RJN Exh. 2.

Here, there is no dispute that PG&E's wholesale power and transmission costs between June 2000 and January 2001 exceeded its retail rate revenues by $8.3 billion.  The CPUC nonetheless seeks to justify its refusal to pass through these costs by arguing that they should be netted against prior revenues from sources unrelated to retail rates, including gain on sales of PG&E's power plants; proceeds of rate reduction bonds which were earmarked by AB 1890 exclusively for the recovery of stranded costs; and the "paper" entries reflecting the market value of PG&E's own generated electric power.  McManus Decl. ¶¶ 21-23, 30-34.  This accounting legerdemain fails to satisfy the CPUC's obligation under federal law to treat FERC-approved costs as reasonable operating expenses when setting retail rates, and to allow PG&E to recover its operating expenses from its retail customers.

### (2)    May the CPUC Reach Back Four Years to Net PG&E's Power Costs Against Historic Revenues?

In addition to the fact that most of the revenues the CPUC seeks to net against PG&E's power

---

[13] State cases are to the same effect.  *See Washington Gas Light Co. v. PSC*, 508 A.2d 930, 938 (D.C. 1986) (state commission required "to consider the FERC-approved GRI surcharges as 'reasonable operating expenses,'" and "must permit those expenses, in their entirety, to be passed through to the ratepayers;" this "is constitutionally mandated, because 'under the due process clause of the Constitution no public utility [can] be compelled to absorb its own costs and not pass them on to the consumer.'"); *General Motors Corp. v. Illinois Commerce Comm'n*, 574 N.E.2d 650, 657 (Ill. 1991) (filed rate doctrine required Illinois Commerce Commission to allow distributors to recover the costs of the pipelines' FERC-approved take-or-pay obligations to gas producers;"[t]he Supreme Court has consistently acknowledged that the filed rate doctrine prohibits a State commission from "trapping" FERC-approved wholesale costs, which would occur if a State commission prevented a distributor from fully recovering those wholesale costs in retail rates."); *Associated Natural Gas Co. v. PSC*, 954 S.W.2d 520, 531 (1997) ("the filed rate doctrine prohibits a state regulatory commission from 'trapping' FERC-
*(Footnote continued)*

PG&E'S MOTION FOR SUMMARY JUDGMENT
C 01-03023 VRW

1    costs do not derive from retail rates, and that a substantial portion do not even reflect cash receipts, the

2    revenues also were recorded over a several-year period beginning in January 1998.  Thus the Acct'g

3    Order rests on the fiction that such cash as PG&E actually received over that period is available to pay

4    for the wholesale power costs incurred years later.  That is a wholly untenable assumption.  PG&E

5    utilized its past revenues for legitimate business purposes, including payments for income taxes, debt

6    retirement and shareholder dividends.  These settled transactions upon which PG&E and numerous third

7    parties have relied obviously cannot be unwound in order to allow PG&E to recover its undercollection.

8    To do so would defy all principles of equity.  *See*, *e.g.*, *United States v Georgia-Pacific Co.*, 421 F.2d

9    92, 95-96 (9th Cir. 1970) (equity adjusts the rights of parties according to principles of fairness and good

10   conscience to prevent a party from taking inconsistent positions to the detriment of another party).

11          In any event, this aspect of the Acct'g Order also is unsustainable as a matter of law.  Under

12   longstanding precedent, a ratemaking agency cannot constitutionally justify a confiscatory rate by

13   asserting that the rate is offset by excess rates collected in the past.  This was the Supreme Court's

14   holding in *Board of Public Utility Com'rs*, 271 U.S. 23 (1926), a case very similar to this one.  The state

15   commission had ordered that a utility's excess depreciation reserves accumulated in the past should be

16   offset against the utility's current costs of service in order to sustain otherwise inadequate retail rates.

17   The Supreme Court struck down the rate order, because

18          [t]he revenue paid by the customers for service belongs to the company.  The amount, if
19          any, remaining after paying taxes and operating expenses including the expense of
             depreciation is the company's compensation for the use of its property. . . . *And the law*
20          *does not require the company to give up for the benefit of future subscribers any part of*
             *its accumulations for past operations.  Profits of the past cannot be used to sustain*
21          *confiscatory rates for the future.*"

22   *Id*. at 32 (emphasis added).  The Court went on to hold that where the retail rates were insufficient to

23   yield a just return to the utility, "the property . . . of the company . . . cannot be used to make up the

24   deficiency."  *Id*. at 32.  *Accord Calfarm Ins. Co. v. Deukmejian*, 48 Cal. 3d 805, 819 (1989) ("no case

25   supports an unreasonably low rate of return on the ground that past profits were excessive").

26          **(3)    Should Historic "Headroom" Be Treated Differently than Other Past
                    Revenues for Filed Rate Purposes?**

27   ─────────────────────────

28   approved costs by preventing a distributor from fully recovering those costs from its retail customers.").

                                        18

Pursuant to AB 1890 and CPUC regulations, the $2.75 billion in "headroom" revenues that PG&E had collected prior to the onset of the energy crisis in June 2000 were applied against PG&E's stranded costs at the time they were received. McManus Decl. ¶ 7. The CPUC has suggested in this case that, because PG&E benefited from this "excess" retail rate recovery in the early years of the transition period, it is fair now to offset the historic headroom revenues against PG&E's 2000-2001 wholesale costs. But the CPUC's current characterization of PG&E's headroom recoveries as "supraprofitable" works only in hindsight. At the time headroom was being collected, California IOUs were told by statute that they were entitled to collect those revenues in order to recover their stranded costs, which had been placed at risk when the State opened the electricity market to competition. The utilities and their creditors, suppliers and shareholders alike justifiably relied on the availability of headroom receipts to pay for financial transactions that have long-since closed. Cash derived from previous headroom is no longer available to pay for PG&E's 2000-2001 power costs, any more than cash collected years ago from any other sources. This particular aspect of the Acct'g Order thus suffers from the same infirmity as described in the previous section, which is that it does not match PG&E's costs against any revenues that were actually available to pay for them. There is no basis for treating historic headroom differently than any other historic revenues.[14]

### C.     The Acct'g Order Does Not Provide an Adequate and Independent State Ground for Avoiding the Filed Rate Doctrine.

The CPUC contends that, by virtue of the operation of the Acct'g Order, PG&E's claim devolves into a disagreement about recovery of stranded costs, which is purely a matter of state law over which this Court has no jurisdiction. However, whether defendants have complied with federal law is a matter for this Court, not for themselves, to decide. In one of the numerous *Patch* cases arising out of New Hampshire's similarly ill-starred attempt to deregulate its retail electricity industry, the First Circuit had occasion to consider precisely this same issue. *Patch*, 221 F. 3d 198 (1st Cir. 2000). After protracted

---

[14] Due to changed market conditions, PG&E has been collecting headroom from retail rates again since mid-2001. Those headroom revenues potentially reduce PG&E's undercollection, although far from eliminate it. However, it is unclear in light of the CPUC's prior orders whether it intends to allow PG&E to retain that headroom to recover a portion of its undercollection, absent an order from this Court. *See* McManus Decl. ¶¶ 37-38.

19

1  litigation, the district court had ordered the state commission to allow the utility to recover its FERC-

2  tariffed wholesale costs in rates, relying on the filed rate doctrine. On appeal, the First Circuit rejected

3  the commission's proffered rationale under state law for disallowing the utility's cost recovery, and also

4  rejected the commission's contention that whether the utility had conducted itself prudently in

5  continuing to purchase power under the long-term contract in question was "a matter for the

6  Commission and the state courts" to decide. *Id.* at 203. As the First Circuit explained,

> we are not concerned here with whether the imprudence finding is proper under state law
> but rather whether, given its substance and context, it furnishes a basis for the state
> commission to ignore an otherwise controlling FERC tariff. *In such cases, the*
> *"adequacy" of an asserted "independent state ground" is — indeed, under the*
> *Supremacy Clause must be — an issue of federal law.*

10  *Id. See also Howlett v. Rose*, 496 U.S. 356, 366 (1990) (adequacy of a state-law ground to support a

11  judgment precluding litigation of the federal claim "is a federal question which this court reviews *de*

12  *novo*"). The same analysis applies here. The issue is not whether the Acct'g Order is proper under state

13  law, but whether it constitutes an "adequate and independent state ground" that allows defendants to

14  ignore the controlling FERC tariff. It does not, for the reasons explained above.

15      Moreover, where, as here, the asserted "adequate and independent state ground" represents a

16  reversal in defendants' previous position,[15] the court must scrutinize the state's earlier pronouncements

17  on the same subject to determine whether the newly-enunciated state ground is being "set up as an

18  evasion." *Rogers v. Alabama*, 192 U.S. 226, 231 (1904); *Howlett*, 496 U.S. at 366 (federal court must

19  scrutinize whether State's articulated basis for avoiding Supremacy Clause represents change of course,

20  or novel and unanticipated objection, because State "may be evading federal law and discriminating

21  against federal causes of action"). That is in fact precisely what these defendants have done. TURN

22  urged the CPUC to adopt the Acct'g Order after this lawsuit was first filed, on the ground that the Order

23  "would allow the Commission to establish its compliance with the 'filed rate doctrine,' without

24  requiring ratepayers to pay increased rates." Prepared Direct Testimony of Michel Peter Florio, at 23

25  (Feb. 8, 2001), RJN Exh. 46. Such a pretextual action under color of state law does not suffice to avoid

26  ---

27  [15] The Acct'g Order repudiates a prior CPUC order which *prohibited* the transfer of negative
TRA balances to the TCBA on the ground that allowing such transfers would impermissibly "convert"

*(Footnote continued)*

28

20

the federal preemption mandate. *See Ward v. Board of County Comm'rs*, 253 U.S. 17, 22 (1920) ("if non-federal grounds, plainly untenable, may be thus put forward successfully, our power to review easily may be avoided"); *NAACP v. Alabama*, 357 U.S. 449, 455-58 (1958) ("Novelty in procedural requirements cannot be permitted to thwart review in this Court applied for by those who, in justified reliance upon prior decisions, seek vindication in state courts of their federal constitutional rights.").

### D.    A *Pike County* Review is Sharply Circumscribed in this Case.

Under the *Pike County* exception adopted by some lower courts, a state may inquire into the reasonableness of a utility's decision to purchase power from one source, even at federally-prescribed rates, when a lower-cost alternative source of power was available elsewhere. The CPUC has announced that it intends to conduct such a "prudence" review as to two procurement issues. First, between January 1, 1998 and August 3, 2000, the CPUC compelled PG&E to purchase all of its wholesale power demand solely from the PX and ISO markets. The CPUC has said that it intends to scrutinize whether PG&E bid its load (*i.e.*, the amount of electricity required to serve its customers) prudently as between those markets. Second, on August 3, 2000 the CPUC finally yielded to PG&E's repeated requests that it be allowed to negotiate bilateral purchase contracts directly with wholesale electricity suppliers. The CPUC has said that it will investigate whether PG&E exercised this bilateral contracting authority prudently. (PG&E's First Claim covers the period June 1 to August 2, 2000; the Second Claim covers the period August 3, 2000 to January 19, 2001).

No *Pike County* review of PG&E's load bidding between the PX and the ISO markets is permitted as a matter of law, for two reasons: (1) the CPUC repeatedly has held that all purchases from the PX and ISO are conclusively reasonable, a determination which has been confirmed by the Ninth Circuit; and (2) the filed rate doctrine prohibits the CPUC from second-guessing PG&E's load bidding strategies in the PX and ISO markets because to do so would require the CPUC to theorize what market rates might have been produced under hypothetical alternative load bidding scenarios, an inquiry the filed rate doctrine specifically forbids. *TANC*, 2002 WL 553845, at *8, RJN Exh. 38.

---

procurement costs into stranded costs. *See* CPUC Resolution E-3527 at *14, RJN Exh. 23.

PG&E'S MOTION FOR SUMMARY JUDGMENT
C 01-03023 VRW

**(1)    The CPUC Has Held Unequivocally that PG&E's Purchases from the ISO and PX Are Conclusively Reasonable and Not Subject to Prudence Review.**

The CPUC has held unequivocally that IOUs' purchases from the PX and ISO would be treated as conclusively reasonable and not subject to *Pike County* review.  The CPUC first announced this determination in the decision that set the basic framework for the electric industry restructuring, in order to relieve utilities of the risk of cost disallowances stemming from their mandatory participation in the new and untested PX and ISO markets.  *Order Instituting Rulemaking*, D.95-12-063 (Dec. 20, 1995), as amended by D.96-01-009 (Jan. 10, 1996) RJN Exh. 27.  The CPUC repeatedly reaffirmed this guarantee at every key juncture in the market's development, such as the orders granting PG&E authority to buy power in the BFM and by bilateral contracting, holding that the prices paid in all the PX and ISO markets are "deemed reasonable" or "prudent," and exempt from "contentious regulatory proceedings to determine reasonableness."  The complete litany of the CPUC's holdings appears in Appendix A hereto. After considering this same record, the Ninth Circuit concluded that, during the AB 1890 transition period, "the [California utilities] were required to . . . purchase all of their required electricity supply from the CalPX spot markets, and such purchases *were deemed to be "per se prudent" by the CPUC*." *California Power Exchange*, 245 F. 3d at 1114-15.  The court further said that the CPUC had "declare[d] [utilities'] purchases of electricity in the CalPX spot market as presumptively prudent — *essentially immunizing such purchases from further CPUC prudence review*." *Id.* at 1117 n.5 (emphasis added).  The CPUC cannot repudiate its own decisions, confirmed by the Ninth Circuit, and announce that its new-found intention to conduct prudence reviews of PG&E's PX and ISO purchases defeats entry of summary judgment in this case.

**(2)    In Any Event, Any Pike County Review of PG&E's Load Bidding Strategy in the PX and ISO Markets Would Violate the Filed Rate Doctrine.**

In addition to requiring state regulators to accept FERC-tariffed costs as conclusive for retail ratemaking purposes, the filed rate doctrine also prohibits any entity, whether court or agency, from theorizing as to what alternative rate might have resulted under circumstances different than those led to the tariffed rates actually paid by a utility.  The Ninth Circuit has just handed down a decision that reaffirms and elaborates this strand of the filed rate doctrine.  In *TANC*, the court explained that

At its most basic, the filed rate doctrine provides that state law, and some federal law . . .

22

may not be used to invalidate a filed rate *nor to assume a rate would be charged other than the rate adopted by the federal agency in question*. . . . As further developed, the filed rate doctrine has prohibited not just [a state or federal court] from setting a rate different from that chosen by FERC, *but also from assuming a hypothetical rate different from that actually set by FERC.*

2002 WL 553845, at *7-*8, RJN Exh. 38 (emphasis added).  The claims before the court were predicated on the plaintiff's theory that, but for the defendants' misdeeds, the FERC would have allocated interstate electricity transmission capacity (a matter within FERC's exclusive jurisdiction) differently than the actual allocation plaintiff received.  The court found that the filed rate doctrine barred the suit because, in order to find for plaintiff, the court would have to hold that "TANC was entitled to [a different quantity of transmission] capacity.  Yet, state law can no more assume how FERC would allocate access to interstate transmission capacity than it can assume how FERC would set rates." *Id*. at *9.

*TANC* relied, *inter alia*, on the Supreme Court's decision in *Montana-Dakota*, the first filed rate case decided under the FPA, which held that courts may not second-guess the FERC's determination of what constitutes a just and reasonable rate or substitute their own views thereon.  A plaintiff, the Court said, could "claim no rate as a legal right that is other than the filed rate, whether fixed or merely accepted by the [Federal Power] Commission, and not even a court can authorize commerce in the commodity on other terms."  341 U.S. 246, 251; *see also id*. at 251-52 (court "can assume no right to a different [rate] on that ground that, in its opinion, it is the only or the more reasonable one.").[16]

This rule applies in the PX and ISO load bidding context because PG&E's bidding practices cannot be separated from price.  PG&E was one of many participants in a complex and highly interdependent market, and one of the largest purchasers of electricity.  Any shift in PG&E's procurement practices necessarily would have affected the behavior of other market participants and

---

[16] *See also Arkla*, 453 U.S. at 577-78 (considerations underlying doctrine "are preservation of the agency's primary jurisdiction over reasonableness of rates"); *Keogh*, 260 U.S. 156, 163-64 (upholding dismissal of antitrust suit alleging that rates filed with ICC were result of price-fixing conspiracy; to show "injury," plaintiff would have to establish that the ICC would have approved a "hypothetical lower rate," a forbidden inquiry); *Fax Telecomm.*, 138 F.3d at 489 ("the filed rate doctrine preserves the exclusive role of federal agencies in approving rates . . ., a function that the federal regulatory agencies are more competent to perform"; asking court to enforce rate structure never filed with agency is "interfer[ing] inappropriately in the rate-making process in violation of the nonjusticiability strand").

market dynamics, leading inevitably to different market prices on a daily or even an hourly basis.  Falk Decl. ¶¶ 6, 8, 22-23, 27-28.  Indeed, that is just what the CPUC wishes to show by conducting a prudence review — that PG&E could have paid less for power by using alternative load bidding strategies.  For the CPUC to conduct such an inquiry would require it to theorize as to what rates might have been produced had PG&E bid its load differently, which would be legally impermissible.  Altering the "inputs" into FERC's market-based tariff structure — as the CPUC necessarily must do if it assumes PG&E should have pursued a different bidding strategy — inevitably would have led to different market clearing prices, and thus different "rates" paid for power than what PG&E actually paid.  *Id*.  This is exactly the kind of assumption that *TANC* and *Montana-Dakota* prohibit.  Furthermore, the CPUC's proposed inquiry would entail an extremely attenuated and unsupportable chain of causation, for the CPUC would be required to theorize not only what PG&E should have done differently, but also how other market participants would have reacted to such a hypothetical strategy.  Given the unparalled complexity of the relevant market, such an analysis would be scientifically unsound and its output would by hopelessly unrealistic.  Falk Decl. ¶¶ 27-28.  The CPUC thus is barred from conducting any *Pike County* inquiry as to the prices PG&E paid for power in the PX and ISO markets, which were, after all, set by the ordinary operation of the markets, predicated on the theory that PG&E pursued an "unreasonable" bidding strategy.

### (3)    The Court May Enter Summary Judgment in PG&E's Favor, and Allow the CPUC to Conduct a Limited Reasonableness Review.

PG&E agrees that a limited reasonableness review into the prudence of costs incurred under PG&E's bilateral contracts, which comprise a relatively small portion of PG&E's overall wholesale costs, falls within the bounds of a permissible *Pike County* inquiry.  Indeed, a proceeding currently underway at the CPUC includes that issue.[17]  However, PG&E disagrees that the potential for any prudence review, however delimited, prohibits entry of summary judgment on PG&E's preemption claims.  Even if there were no *Pike County* review at all and if PG&E prevails, this proceeding must be

---

[17] Application of PG&E in the 2001 ATCP, A.01-09-003 (Sep. 4, 2001).  The ATCP currently purports to include reasonableness review of both PX/ISO procurement and bilateral contract issues.  A decree from this Court defining the scope of a permissible *Pike County* review thus would operate to

*(Footnote continued)*

24

returned to the CPUC for entry of a rate order that complies with this Court's ruling, because ratemaking is a quasi-legislative undertaking that must be conducted by the CPUC. Any permissible reasonableness review would be just one aspect of that subsequent CPUC proceeding. Thus, should the Court decide that a *Pike County* review is permissible here, it still may enter a decree that defendants must, under federal law, allow PG&E to recover its prudently-incurred wholesale costs in prospective rates, subject to a prudence review conducted by the CPUC in accordance with the limits set by this Court. For example, the Court may determine that the filed rate doctrine allows the CPUC to inquire into the reasonableness of PG&E's bilateral contract costs, but that any inquiry into PG&E's load bidding is "off-limits" for the reasons stated above, and issue an appropriate declaratory order to this effect. That issue is no obstacle to entry of summary judgment because the identical issue would persist even following a trial of this matter.[18] Finally, the CPUC has argued continuously that it needs discovery to establish the existence of PG&E's purchasing alternatives. That is not the case. PG&E was permitted to buy power only on the terms explicitly prescribed by the CPUC. Thus, the existence of PG&E's "procurement alternatives" can hardly be a mystery to the defendants. The discovery that defendants purport to seek here relates not to the *existence* of PG&E's procurement alternatives, which are undisputed, but rather to the *quantification* of whatever disallowance the CPUC might impose in the course of a prudence review respecting the bilateral contracting issue. Such discovery would take place in the CPUC's subsequent regulatory proceeding, and is irrelevant here.

## IV. CONCLUSION

PG&E respectfully requests entry of judgment on its First and Second Claims in its favor.

DATED: April 18, 2002                HELLER EHRMAN WHITE & McAULIFFE LLP


By  /s/ Marie L. Fiala
MARIE L. FIALA

---

limit the scope of subsequent proceedings in the ATCP.

[18] PG&E respectfully submits that Judge Lew's contrary conclusion in the SCE litigation was reached because of the different procedural posture in which SCE's claim was presented to that court, which did not allow the court to enter judgment on SCE's entire claim. Order Denying Without Prejudice Defs.' Mot. to Dismiss & Pltf.'s Mot. for Summ. Judg., *SCE v. Lynch,* No. 00-12056-RSWL (Jan. 22, 2001) at 2, RJN Exh. 41.

25

1

Attorneys for Plaintiff
PACIFIC GAS AND ELECTRIC COMPANY

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PG&E'S MOTION FOR SUMMARY JUDGMENT
C 01-03023 VRW

**APPENDIX A**

**CPUC STATEMENTS THAT PG&E'S PURCHASES OF POWER FROM THE
PX AND ISO MARKETS WERE CONCLUSIVELY REASONABLE AND
NOT SUBJECT TO AFTER-THE-FACT PRUDENCE REVIEW**

- In the initial decision that established the PX and set the basic framework for the electric industry restructuring, CPUC stated that PG&E will be allowed "*simply [to] pass on to [its] customers the cost of electric energy as revealed by the [PX] over the billing cycle*"; this was preferable to allowing PG&E to enter into long-term contracts which would require "contentious regulatory proceedings" to "determine the reasonableness" of PG&E's procurement costs.  *Order Instituting Rulemaking*, D.95-12-063 (Dec. 20, 1995), as amended by D.96-01-009 (Jan. 10, 1996) (emphasis added), RJN Exh. 27.

- In the same proceeding, rejecting the idea of conducting after-the-fact prudence reviews, "In the final analysis adding layers of regulatory fixes strikes us [as] a decidedly regressive response to a proceeding launched in the bid to foster and then rely upon market forces."  *Id*. at *75.

- "[A]ll purchases" through the PX made during the rate freeze *would be deemed "reasonable"*; PG&E could "recover the costs of transactions in the enhanced BFM until the end of [its] rate freeze."  CPUC Resolution E-3658, 2000 Cal. PUC LEXIS 416 at *12, *20 (Mar. 16, 2000) (emphasis added), RJN Exh. 20.

- In June 2000, "[W]e find that [PG&E] may procure electricity through the CalPX day-ahead, day of and block forward markets and similar markets in qualified exchanges, and the ISO imbalance energy market, and *deem the prices paid for these products as reasonable.*"  *Final Opinion Regarding Policies Related to Post-Transition Ratemaking*, D.00-06-034, 2000 Cal. PUC LEXIS 505, at *57 (June 8, 2000) (emphasis added), RJN Exh. 18.

- At the same time, "Utility purchases through the CalPX *are deemed reasonable.*"  *Id*. at *71, fn 27 (emphasis added).

- Also in June 2000 decision, CPUC recognized that, "*Under the Pike County doctrine*, a series of state and federal cases have *recognized the right of states to review the prudence of a utility's purchasing decisions*.  That is, the state cannot refuse to let the utility pass through its wholesale costs based on the unreasonableness of the wholesale rates.  However, the state can decide that the utility's decision to pay the wholesale rates was unreasonable in light of the availability of more economical power from alternative sources.  The Commission therefore has oversight of power purchases for retail sale.  *The basis of the 'buy' requirement [that PG&E buy all power from the PX and ISO markets] is the Commission's determination that utility purchases through the CalPX are deemed reasonable.*"  *Id*. at *162, fn 27 (emphasis added).

- In decision authorizing PG&E to purchase power in the Block Forward Market, such BFM purchases are "deemed prudent to the same extent as the cost of other supplies purchased from the Power Exchange or ISO."  CPUC Resolution E-3618, 1999 Cal. PUC LEXIS 902 at *10 (July 8, 2000), RJN Exh. 22.

- In decision authorizing PG&E to purchase power by bilateral contracting, CPUC states, "In D.00-06-034, we approved [PG&E's] purchase of electricity through the CalPx day-ahead, day of and block forward markets and similar markets in qualified exchanges, and the ISO imbalance energy market,

PG&E'S MOTION FOR SUMMARY JUDGMENT
C 01-03023 VRW

and deemed the prices paid for these products as reasonable." *Decision re Bilateral Contacts*, D.00-08-023 at 8 (Aug 3., 2000), RJN Exh. 16.

- In testimony to the FERC by CPUC representative Paul Clanon, "On March 16, 2000 the CPUC approved the advice letters in Resolution E-3658 (RJN 20). *The Resolution affirmed that all PX purchases during the rate freeze are deemed reasonable.*" Prepared Direct Testimony of Paul Clanon, Ex. PUC-11 at 33, FERC Docket EL00-95-004 (Nov. 21, 2000) (emphasis added), RJN Exh. 45.

- In testimony by CPUC President Loretta Lynch before a California Assembly hearing, "[P]urchases through the PX were per se reasonable," including "forward contract[s] through the PX"; "as long as they were buying those PX products, I believe that there was reasonableness attached." Testimony of CPUC President Loretta Lynch Before California Assembly Hearing- Energy Costs and Availability Committee, at 8 (Jan. 11, 2001), RJN Exh. 47.

ii