1  FREDRIC D. WOOCHER (Bar No. 96689)
   MICHAEL J. STRUMWASSER (Bar No. 58413)
2  JOHANNA R. SHARGEL (Bar No. 214302)
   DANIEL J. SHARFSTEIN (Bar No. 210806)
3  STRUMWASSER & WOOCHER LLP
   100 Wilshire Boulevard, Suite 1900
4  Santa Monica, California 90401
   Telephone:   (310) 576-1233
5  Facsimile:   (310) 319-0156

6  ROBERT E. FINKELSTEIN (Bar No. 146391)
   RANDOLPH L. WU (Bar No. 78651)
7  THE UTILITY REFORM NETWORK
   711 Van Ness Avenue, Suite 350
8  San Francisco, California 94102
   Telephone:   (415) 929-8876
9  Facsimile:   (415) 929-1132

10 Attorneys for Applicant in Intervention
   THE UTILITY REFORM NETWORK

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| PACIFIC GAS AND ELECTRIC COMPANY<br><br>Plaintiff,<br><br>v.<br><br>LORETTA M. LYNCH, HENRY M. DUQUE, RICHARD A. BILAS, CARL W. WOOD, and GEOFFREY F. BROWN, in their official capacities as Commissioners of the California Public Utilities Commission,<br><br>Defendants.<br><br>THE UTILITY REFORM NETWORK,<br><br>Applicant in Intervention. | CASE NO. C 01-03023 (VRW)<br><br>DECLARATION OF MATTHEW FREEDMAN IN SUPPORT OF TURN'S MOTION FOR SUMMARY JUDGMENT<br><br>Date:  May 24, 2002<br>Time:  10:00 a.m.<br>Judge: Hon. Vaughn R. Walker<br>Dept.: Courtroom 6<br><br>[Filed together with Notice of Motion and Motion for Summary Judgment; Memorandum of Points and Authorities in Support Thereof; Declaration of Robert E. Finkelstein; [Proposed] Order Granting Motion for Summary Judgment] |

*PG&E v. Lynch et al.*
DECLARATION OF FREEDMAN IN SUPPORT OF TURN'S MOTION FOR SUMMARY JUDGMENT
Case No. C 01-03023 (VRW)

I, Matthew Freedman, declare:

1. I am an attorney admitted to practice in the State of California. I am a Staff Attorney on the staff of The Utility Reform Network ("TURN"), a position I have held since early 2000. In that position my responsibilities have included the development of cost and revenue analyses and the preparation of reports presenting those analyses, including a review of the electric utilities' transition cost collections as of October 2000, and an analysis of the impact of PG&E's proposed Plan of Reorganization in its Chapter 11 bankruptcy proceeding. I have personal knowledge of the statements herein, and if called upon to do so, could and would testify competently thereto.

2. Prior to joining TURN's staff I held a variety of positions involving the analysis of energy policy and regulation. From 1993 through 1998, I was Senior Energy Policy Analyst for Public Citizen's Critical Mass Energy Project, where my work involved research, writing and legislative advocacy on a variety of energy policy issues including electric deregulation at the national and state levels. In this position, I was responsible for compiling and analyzing data as part of preparing numerous reports. Some of these reports were extremely data-intensive. In 1998 and 1999, I was a Policy Analyst for Massachusetts Public Interest Research Group ("MassPIRG"), performing policy analysis, data collection and legal research on environmental issues associated with the restructuring of the state's electricity industry.

3. The purpose of this declaration is to determine, based on PG&E regulatory filings made on a regular basis with the California Public Utilities Commission ("CPUC"), the net effect of the AB 1890 rate freeze on PG&E, and, in particular, to test the proposition that the utility failed to recover its wholesale procurement costs (or any other type of costs other than uneconomic generation costs) during the rate freeze period.

**HOW THE RATE FREEZE WORKS**

4. To implement the rate freeze called for in Public Utilities Code Section 368(a) and to track the collection of "transition costs" (the label used to refer to the above-market cost of uneconomic power plants, which the utilities are authorized to recover under Section 367), the CPUC established two major accounts for tracking each utility's revenues and expenses during the "transition period" when the rate freeze would be in effect. These two accounts are the Transition Revenue Account ("TRA") and the Transition Cost Balancing Account ("TCBA").

1

*PG&E v. Lynch et al.*
DECLARATION OF FREEDMAN IN SUPPORT OF TURN'S MOTION FOR SUMMARY JUDGMENT
Case No. C 01-03023 (VRW)

5. The TRA serves to record revenues from the utility's frozen rates, and to allocate the resulting revenues among the various utility expenses. In other words, the rates paid by PG&E's retail ratepayers are recorded in the TRA. They are then allocated out of the TRA to cover the costs of providing current service, such as the reasonable costs to operate the transmission and distribution systems, the costs of procuring energy, the costs for future decommissioning of the utility's nuclear plants, and other expenses. Any revenues still in the TRA after those current costs are deducted are deemed the "Competition Transition Charge" ("CTC") and transferred monthly to the TCBA.

6. The TCBA tracks both the amount of "transition costs" eligible for cost recovery and the amount of revenues collected by the utility. Each month, the utility enters in the TCBA the revenues recorded from a number of sources. These include the monthly transfer from the TRA (the stranded-cost collections achieved through customer rates) during months when the TRA is overcollected (that is, months in which revenues exceed costs), as described above. Other revenue sources to the TCBA include the proceeds (above book value) from the sale of utility-owned assets (the sale of power plants and related facilities sold pursuant to divestiture) and the net revenues from the sale of power generated by the power plants the utility still owns or controls.

7. During the rate freeze period, the Commission-approved treatment of the TRA balance during months when the end-of-month balance was an undercollection (that is, a month in which the costs of providing service exceeded the revenues collected through rates) has varied. When the TCBA and TRA were first established, the monthly balance was to be transferred from the TRA to the TCBA without regard to whether it reflected an undercollection or overcollection. Later, the Commission on its own motion determined that if the TRA was undercollected at the end of a month (that is, if the costs, including purchased-power costs, exceeded revenues in rates), the undercollection was to remain in the TRA rather than being transferred to the TCBA. More recently, the Commission adopted accounting changes that returned to the original ratemaking treatment, with the TRA balance transferred on a monthly basis to the TCBA, whether the TRA balance reflected an undercollection or an overcollection. This was the primary "accounting change" adopted in D.01-03-082.

## ANALYTICAL METHOD

8. The data used for the calculations of PG&E's stranded cost collections and wholesale power purchase undercollections are taken directly from the CPUC's own results and are based on monthly Transition Cost Balancing Account reports PG&E filed with the CPUC pursuant to D.97-11-074 for the years 1998-2002.

2

Case 3:01-cv-03023-VRW    Document 121    Filed 04/18/02    Page 4 of 11

9. The amount of stranded cost collection achieved during each year was determined by tracking revenues credited to the TCBA account in the following areas: (1) transfers from the TRA (in the form of CTC), (2) asset sales, (3) memorandum account transfers associated with PG&E-owned hydroelectric and fossil generation, and (4) revenues received from the California Power Exchange and California ISO for the output of Qualifying Facility contracts, Diablo Canyon, and inter-utility power purchase agreements. Net revenues associated with the generation memorandum accounts are credited to the TCBA consistent with PG&E's reporting for 1998 and 1999 with end-of-year balances used to calculate stranded cost collections for 2000, 2001, and 2002. This data does not reflect PG&E's August 2000 effort to credit an additional $2.1 billion in hydroelectric market valuation to the TCBA. Power purchase undercollections reflect PG&E's recorded end of year balances in the Transition Revenue Account for 1998, 1999, 2000, 2001 and February of 2002.

10. In order to determine PG&E's net collection of stranded costs, I applied the recorded TRA undercollections against the total stranded cost collection achieved at the end of each year. This is consistent with the original accounting treatment approved by the CPUC for these accounts, and the treatment recently revived in D.01-03-082.

**FINDINGS**

11. Over the course of the transition period, PG&E was able to recover all of its costs of providing service as reflected in the TRA, including its wholesale electric procurement costs, and a portion of the uneconomic generation costs recorded in the TCBA that were eligible for recovery during the transition period.

12. Attached to this declaration is Exhibit A, which depicts on an annual basis PG&E's total recorded stranded cost collections and the end-of-year TRA balances.

13. Also attached to this declaration is Exhibit B, which depicts on a cumulative basis PG&E's total recorded stranded cost collections and the end-of-year TRA balances. This graph makes clear that, from the beginning of the transition period through February 2002, PG&E had collected $14.4 billion to apply to its stranded costs while experiencing $6.66 billion in power purchase undercollections as recorded in the TRA. After fully recovering its TRA power purchase undercollections, PG&E is left with a net of approximately $7.75 billion to be applied to stranded cost recovery.

14. Exhibit C attached to this declaration nets the total recorded stranded cost collections figure against the end-of-year TRA balance on an annual basis. This graph illustrates the annual growth in PG&E's recorded

3

*PG&E v. Lynch et al.*
DECLARATION OF FREEDMAN IN SUPPORT OF TURN'S MOTION FOR SUMMARY JUDGMENT
Case No. C 01-03023 (VRW)

collection of stranded costs after payment of the wholesale procurement costs, as well as all other costs of providing service reflected in the TRA.

## CONCLUSION

15.     PG&E has fully recovered all of its procurement costs, as well as all of its other costs of providing service during the transition period.  There was no therefore no undercollection of any cost of providing service.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at San Francisco, California, this 18th day of April, 2002.


                                                        s/ Matthew Freedman

4

# EXHIBIT A



# EXHIBIT B



# Cumulative PG&E Stranded Cost Collections (TCBA)

*Compared with power purchase undercollections (TRA)*



# EXHIBIT C

